UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOKESH VUYYURU, <br><br> *Plaintiff*, <br> v. <br><br> Y.S. JAGAN MOHAN REDDY et al., <br><br> *Defendants*. | Civil Action No. 22-1453 (TJK) |

### MEMORANDUM OPINION

Proceeding pro se, Plaintiff sued under the Racketeering Influenced and Corrupt Organizations Act against ten named and five anonymous defendants. The Court has since dismissed one of those defendants, Indian Prime Minister Narendra Modi, from the case. Of the nine remaining named defendants, six are officials of the Indian government, and one is the chair of the World Economic Forum. No named defendant has appeared, and the Clerk of Court entered default against them. Plaintiff now moves for default judgment. But his complaint fails to present a federal question suitable for decision. Instead, it advances vague, unsupported claims of a wide-ranging conspiracy involving the Indian and United States governments and the World Economic Forum. When stripped of such allegations, his complaint contains nothing but unconnected events that fail to support Plaintiff's conclusions or any conceivable claims. Thus, the Court will deny his motion and sua sponte dismiss the case for lack of subject-matter jurisdiction.

**I.    Background**

    **A.    Factual Background**

Plaintiff's sprawling complaint accuses a host of powerful people of wrongdoing. For example, Plaintiff accuses Defendant Jagan Reddy of "rampant corruption and looting of . . . resources" intended to alleviate the COVID-19 pandemic, importing heroin into India, and hacking

unsuspecting users' cellphones.  *See* ECF No. 1 ("Compl.") ¶¶ 33, 53–56.  Plaintiff also goes as far as accusing Defendant Ramakrishna Reddy of "every crime in the text book [*sic*]."  Compl. ¶ 7.  The shotgun, conclusory nature of Plaintiff's pleading—combined with its length and breadth—makes it difficult to discern the exact nature of his claims.  But because he appears pro se, the Court has attempted to "infer the claims made wherever possible," seeking to identify "all possible legal theories that could apply."  *See Davis v. United States*, 973 F. Supp. 2d 23, 26 (D.D.C. 2014).

The factual core of his complaint seems to relate to plans to develop a city in India.  In short, Plaintiff says he developed "[t]emplates" for a "futuristic city" that would serve as the capital of an Indian state.  *See* Compl. ¶¶ 50–52.  Plaintiff gave those templates to local officials.  *See* Compl. ¶ 116.  Among other things, Plaintiff planned to open offices of his businesses there.  *See* Compl. ¶¶ 16, 103, 122–23.  But a "criminal syndicate" comprising the Indian prime minister, the chair of the World Economic Forum, and various other Indian officials destroyed those plans, causing "huge financial losses."  *See* Compl. ¶¶ 6, 26, 61, 133.

Beyond that outline, specific allegations are hard to pin down.  What follows is the Court's attempt to construct a narrative from Plaintiff's filings, including those beyond his complaint.

\*     \*     \*

Plaintiff is a physician, philanthropist, publisher, businessman, and social activist.  Compl. ¶ 14.  He is a U.S. citizen, ECF No. 12 at 2, but he "moved to India in 2014."  Compl. ¶ 121.  Plaintiff runs a newspaper called the *Virginia Times* and edits a magazine called *Dolus*.  Compl. ¶ 15.  He also publishes on social media.  *Id.*  His editorial work has often criticized Defendants and the Indian government.  *See id.*  He has also accused Defendants of wrongdoing through other channels, such as interviews with other journalists and by direct messages to Defendants.  *See*

Compl. ¶¶ 84–86, 124, 127, 135–36.

Plaintiff has started several other businesses, including a health-care business and an information-technology business in the city he hoped to develop. *See* Compl. ¶ 16. Plaintiff also opened a hospital elsewhere in India in 2014. *See* ECF No. 13-2 ¶ 17.

Seven of the ten named defendants are officials of the Indian government. Their titles include prime minister, chief minister, "de-facto chief minister," and various election commissioners. *See* Compl. ¶¶ 3–12. The remaining named defendants are the chair of the World Economic Forum, Compl. ¶ 6, a "business man [*sic*]," Compl. ¶ 5, and a "broker[ ]" for whom Plaintiff gave no specific official title, Compl. ¶ 10.

Plaintiff also named five anonymous defendants. He describes them collectively as "individuals and organizations in various powerful positions in America." *See* Compl. ¶ 63 (capitalization altered). Of those, one is "a powerful American politician," who aided other defendants by "bringing . . . dirty money to America." *See* Compl. ¶ 138. Another, whose name Plaintiff later provided, is "a de facto key operator of [*sic*] Prime Minister of India's office." ECF No. 13-2 ¶ 3. Plaintiff made a few collateral references to a third anonymous defendant, who appears to have the ability to influence Indian elections and to incite others in India to act violently. *See* Compl. ¶¶ 100–102, 118, 120, 122, 131, 133–34. But Plaintiff did not otherwise identify this defendant. Plaintiff provided no information about the other two anonymous defendants.

Plaintiff is familiar with Defendants' actions because he "dealt with" them "in various capacities from 2014 to 2021." *See* ECF No. 13-2 ¶ 20. At some point, Plaintiff came to believe that Defendants were acting illegally in the city where his hospital was located. *See* Compl. ¶ 37. He also believed Defendants conspired to interfere in Indian elections in violation of that nation's laws and constitution. *See* Compl. ¶¶ 38–44, 84–86.

Plaintiff's plans for a futuristic capital city required the input of American architectural, engineering, and design firms. *See* Compl. ¶ 51. Plaintiff also "personally spent money"—$5 million—on developing those plans. *See* Compl. ¶ 115; ECF No. 13-2 ¶ 18. He gave those plans to local officials in June 2014. Compl. ¶ 97. At first, Prime Minister Modi supported his proposal. *See* Compl. ¶ 98. Indeed, he had endorsed the idea even before he became prime minister. *See* Compl. ¶ 115. But later—thanks to alleged bribery—Defendants undermined the plan with "systematic organized propaganda." *See* Compl. ¶ 99. That propaganda included "false cases in the courts" and a "nonsense book" on the city. *See* Compl. ¶ 118. Instead of Plaintiff's plan, Defendants announced they would build "Three Capitals." *See* Compl. ¶ 152(dd).

In August 2014, Plaintiff arranged a collaborative meeting in Virginia with an American company. *See* ECF No. 13-2 ¶ 9. Plaintiff, however, missed that meeting. *See id.* ¶ 12. Later, he learned that a representative of Prime Minister Modi had attended the meeting and informed company representatives that they would need to bribe Prime Minister Modi to do business in India. *See id.* ¶¶ 8–11. In response, the company threw the representative out of the office. *See id.* ¶ 13.

In February 2018, "political goons of the defendants" "looted" Plaintiff's hospital. ECF No. 13-2 ¶ 17. Plaintiff told "American embassies" about that incident and other related corruption. *See* Compl. ¶ 135. Defendants, though, committed "at least two acts of witness retaliation against Plaintiff and other [U.S.] citizens." *See* Compl. ¶ 143. They also assaulted his employees and destroyed his equipment, forcing his hospital to close. *See id.*

In June 2019, Jagan Reddy became chief minister of the state in which Plaintiff's city was to be built. *See* Compl. ¶ 103. Jagan Reddy "directly shut down" Plaintiff's project. *Id.* His efforts included "violence and destruction." *See* Compl. ¶ 119. Fifteen months after those efforts began, Plaintiff's offices in the city closed. *See* Compl. ¶¶ 103. Plaintiff suggests that Defendants

retaliated against him for his prior criticisms, including his exposure of election fraud. *See* Compl. ¶¶ 143–44, 146–47, 158. Alternatively, he attributes their actions to his refusal to bribe them. *See* ECF No. 13-2 ¶ 19. As a result, Plaintiff and his businesses, including those in the city and the *Virginia Times*, suffered financial losses. *See* Compl. at 53. Plaintiff estimates those losses at $150,000. *Cf.* ECF No. 13-2 ¶ 29 (describing his alleged "unliquidated damages").

Perhaps as part of that unrest, Defendants "attack[ed] American investors," driving them out of India, which permitted Defendants to "grab their assets for pennies on dollars [*sic*]." *See* Compl. ¶ 136. For the same purpose, Defendants "incit[ed] violence" by others. *See* Compl. ¶ 150(d). The United States experienced resulting harm from reduced tax revenue and job losses. *See* ECF No. 13-1 ¶ 7. Because of Defendants' corruption, Plaintiff says, American companies could not do business, forgoing "billions of dollars" in revenue. *See* Compl. ¶¶ 46, 50–51, 95.

During the COVID-19 pandemic, Plaintiff provided humanitarian aid to India. *See* Compl. ¶ 53, 125. His efforts were frustrated, though, by what he views as Defendants' inappropriate use of resources such as vaccines and bleach. *See* Compl. ¶¶ 53–55. Those transactions generated money that Defendants funneled into companies owned by Defendant Adani. *See* Compl. ¶¶ 53–58. The World Economic Forum is involved in laundering those funds. *See* Compl. ¶¶ 61–62. Separately, Jagan Reddy stores his ill-gotten gains in various "shell suite case companies," offshore bank accounts, and fraudulent charities. Compl. ¶¶ 77–80, 88. Collectively, Defendants have sent much of that money to the United States—"more than $250 billion dollars [*sic*] in less than 10 years." *See* Compl. ¶ 90.

That money has been used to construct "a parallel economy" and to bribe U.S. politicians. *See* Compl. ¶ 92. It has also been used to create a "parallel [g]overnment" in the United States, supported by the "parallel economy," which "wield[s] unbelievable power in [U.S.] government."

5

*See* Compl. ¶ 152(k). As an example of that power, the money was used to bribe "Virginia Politicians" to write "Amicus briefs" that led the "Supreme court of Virginia" to "exonerate" former governor Bob McDonnell. *See* ECF No. 13-2 ¶ 27.[1]

In September 2021, Plaintiff tried personally to arrest Prime Minister Modi. *See* Compl. ¶ 152(ff). Although Plaintiff "got permission from Park services and informed the secret service," Prime Minister Modi "escaped." *Id.*

\*   \*   \*

The remaining allegations in Plaintiff's complaint have even less narrative coherence. For example, he devotes considerable space to attacking Defendants' lineages, claiming that they descend from criminals and corrupt officials. *See* Compl. ¶¶ 17–20, 25, 66, 78–79. Apparently as background information, Plaintiff also elaborates on the ways he thinks Defendants and others became wealthy and came to power. *See* Compl. ¶¶ 21–24, 26–36, 38–45, 48, 57, 60, 65–79, 81–83, 87, 89, 96, 100–01, 106–09, 149. He accuses them of terrible—but seemingly unrelated—acts such as murder, rape, massive thefts, fraud, looting, "thuggery," corruption, smuggling, blackmail, censorship, neglecting impoverished people, and religious persecution. *See* Compl. ¶¶ 25, 47, 49, 56, 58–59, 61–62, 68, 88, 110–11, 126, 128–32, 150–54. And he derides their poor intelligence and lack of education. *See* Compl. ¶¶ 101–02, 118, 134; ECF No. 13-2 ¶ 4.

\*   \*   \*

Plaintiff's complaint brings three categories of claims. The first asserts "abuse of process," but Plaintiff does not specify under what legal authority. *See* Compl. ¶¶ 64–112. The second asserts "statutory business conspiracy," and again Plaintiff does not suggest what statute he means

---

[1] Plaintiff elsewhere suggests that the money was instead (or also) used to bring about McDonnell's "Down fall [*sic*]." *See* Compl. ¶ 93.

6

to invoke. *See* Compl. ¶¶ 113–38. The third asserts violations of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), codified at 18 U.S.C. § 1961 *et seq*. *See* Compl. ¶¶ 139–70.

### B. Procedural History

Plaintiff filed a series of hand-written affidavits attesting service on the named Indian defendants. *See generally* ECF No. 6. Each such affidavit reports that he personally served the "Ministry of Law & Justice under [the] Hague Convention." *See id.* at 1, 3, 5, 7, 9, 11, 13, 15, 17, 19. As to Defendant Schwab, Plaintiff filed an affidavit reporting that he mailed the summons and complaint to an address in Cologny, Switzerland, *see* ECF No. 7, and a document that apparently is meant to reflect service on Schwab consistent with the requirements of the Hague Convention, *see* ECF No. 10. When Defendants did not appear, Plaintiff filed an affidavit of default swearing he had "served the summons as directed by the Honorable court." *See* ECF No. 8 at 2. The Clerk of Court entered default against all Defendants. *See* ECF No. 9.

The United States then filed a suggestion of immunity for Defendant Prime Minister Modi. *See* ECF No. 11. Noting that Prime Minister Modi is currently "India's head of government," ECF No. 11-1, it argued that he is immune from suit, ECF No. 11 at 1–7. The Court allowed Plaintiff to respond to that notice, Min. Order of Dec. 8, 2022, and he agreed to withdraw his claims against Prime Minister Modi, ECF No. 12 at 1. Thus, the Court dismissed Defendant Prime Minister Modi from the case. Min. Order of Dec. 29, 2022.

Plaintiff now moves for default judgment as to the remaining defendants. *See* ECF No. 13. He asks the Court to enter default judgment for "$5.1 Billion," divided up in varying amounts

among them. *See* ECF No. 13-1 ¶ 12.[2] That number does not appear to include his separate request for "unliquidated damages in the amount of $150,000," and on top of those figures, he requests "[a]ttorney fees of $25,000." *See* ECF No. 13-1 ¶ 11.

## II. Legal Standards

Federal Rule of Civil Procedure 55 creates a "two-step procedure" for obtaining a default judgment. *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 102 (D.D.C. 2015). First, after a defendant "has failed to plead or otherwise defend," the plaintiff may request that the Clerk of the Court enter default against that defendant. Fed. R. Civ. P. 55(a). Second, after default is entered, the plaintiff may move for a default judgment. Fed. R. Civ. P. 55(b)(2). An entry of default "establishes the defaulting party's liability for the well-pleaded allegations of the complaint." *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011) (collecting cases). But this "does not automatically establish liability in the amount claimed by the plaintiff." *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 12 (D.D.C. 2013). Instead—unless the plaintiff seeks a sum certain—the Court "is required to make an independent determination of the sum to be awarded." *See Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002).

Before awarding damages against absent parties, the Court has an "affirmative obligation" to ensure it has subject-matter and personal jurisdiction. *See James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019). That is, it must verify that Plaintiff pleaded "facts sufficient to establish subject matter jurisdiction," *Herbin v. Seau*, 317 F. Supp. 3d 568, 572 (D.D.C. 2018) (quotation

---

[2] The requests specified elsewhere in his motion appear to add up to $11 billion, or $10 billion if the request against Prime Minister Modi is excluded. *See* ECF No. 13 ¶¶ 1–10.

8

omitted), and to make a prima facie showing that the Court has personal jurisdiction over Defendants, *see Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). Meeting that burden requires more than conclusory statements and bald accusations. *See Hasenfus v. Corp. Air Servs.*, 700 F. Supp. 58, 62 (D.D.C. 1988); *Affordable Hous. Specialist, LLC v. J&L Cattle Co., LLC*, No. 21-CV-2854 (CKK), 2022 WL 8180359, at *1 (D.D.C. Apr. 11, 2022). If Plaintiff fails to meet that burden, the Court should not only deny the motion, but it should also dismiss the complaint. *See Herbin*, 317 F. Supp. 3d at 572; *Trudel v. Suntrust Bank*, 302 F. Supp. 3d 140, 144 (D.D.C. 2018).

Because Plaintiff proceeds pro se, the Court must construe his filings liberally. *See Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017). That means, among other things, considering factual allegations from all his filings, not just his complaint. *See Watson v. D.C. Water & Sewer Auth.*, 249 F. Supp. 3d 462, 464 (D.D.C. 2017); *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015). Ultimately, though, that lower standard does not absolve Plaintiff of the need to plausibly plead facts that establish jurisdiction. *See Bickford v. United States*, 808 F. Supp. 2d 175, 179 (D.D.C. 2011).

### III.   Analysis

Plaintiff's filings establish neither subject-matter jurisdiction nor personal jurisdiction over any defendant. At bottom, he offers just a diffuse list of misfortunes without anything besides conclusory allegations to connect them to Defendants. For that reason, he has failed to establish a substantial federal question over which this Court has jurisdiction. What is more, his allegations do not suggest any specific contacts between Defendants and the United States, let alone the District of Columbia. Nor do they hint that Defendants' supposed schemes were motivated by their desire to harm the United States generally. For those reasons, Plaintiff has failed to make a prima facie case for personal jurisdiction over Defendants. Thus, the Court will deny his motion for default judgment and sua sponte dismiss his complaint.

A. **The Court Lacks Subject-Matter Jurisdiction Because Plaintiff's Claims Are Patently Insubstantial**

Federal courts have "limited jurisdiction" and must presume unless a party shows otherwise that "a cause lies outside this limited jurisdiction." *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). That limited jurisdiction does not include claims "so attenuated . . . as to be absolutely devoid of merit, wholly insubstantial, or obviously frivolous." *Williams v. Davis*, No. 22-CV-02178 (APM), 2022 WL 3585650, at *1 (D.D.C. Aug. 22, 2022) (quoting *Hagans v. Lavine*, 415 U.S. 528, 536–37 (1974)) (alterations adopted). The term for such claims is "patently insubstantial"—and they "may be dismissed on jurisdictional grounds." *Tooley v. Napolitano*, 586 F.3d 1006, 1009 (D.C. Cir. 2009) (quotation omitted).

A patently insubstantial claim is "essentially fictitious," not just "doubtful or questionable." *See Ord v. District of Columbia*, 587 F.3d 1136, 1144 (D.C. Cir. 2009) (quotation omitted). And that is a factual conclusion, not a legal one. *See id.* Prototypical examples include "bizarre conspiracy theories, fantastic government manipulations of the will or mind, or any sort of supernatural intervention." *See Bickford*, 808 F.2d at 179 (quotation omitted and alterations adopted). A plaintiff has alleged such a bizarre conspiracy theory if he describes grave malfeasance coordinated among many people, particularly high-ranking government and business officials, without giving specifics or revealing the basis of his knowledge.[3] Such allegations are "inherently unrealistic" and so need not be presumed true. *See Roum v. Bush*, 461 F. Supp. 2d 40, 47 (D.D.C. 2006).

---

[3] *See, e.g.*, *Baszak v. FBI*, 816 F. Supp. 2d 66, 68–69 (D.D.C. 2011); *Bickford*, 808 F. Supp. at 182; *Wightman-Cervantes v. Mueller*, 750 F. Supp. 2d 76, 79 (D.D.C. 2010); *Lamb v. ATF*, No. 20-CV-3036 (TJK), 2022 WL 203433, at *3–4 (D.D.C. Jan. 24, 2022), *aff'd*, No. 22-5038, 2022 WL 2387560 (D.C. Cir. June 30, 2022); *Big Sky Civ. Tr. v. United States*, No. 21-CV-1282 (TJK), 2022 WL 1471423, at *3 (D.D.C. May 10, 2022); *Williams*, 2022 WL 3585650, at *1; *Williams v. D.C. Superior Ct.*, No. 22-CV-2993 (APM), 2022 WL 6726801, at *1 (D.D.C. Oct. 11, 2022); *Gilberti v. Fed. Rsrv. Sys.*, No. 19-CV-738 (KBJ), 2019 WL 1901293, at *2 (D.D.C. Apr. 29, 2019), *aff'd*, No. 19-5264, 2020 WL 1487738 (D.C. Cir. Mar. 3, 2020).

That is the nature of Plaintiff's allegations. He describes a vast conspiracy that includes the Prime Minister of India, several other Indian officials, the World Economic Forum, and U.S. politicians.[4] He claims the conspiracy, despite overall aims that could hardly be more grandiose, has devoted substantial energy to targeting him specifically.[5] That conspiracy, if Plaintiff is to be believed, has also been fantastically successful—yet imperceptibly so—in having managed to amass incalculable wealth and even to create a parallel U.S. government and economy.[6] For all that, the only hints at the basis of Plaintiff's knowledge are his claims to have "studied, researched[,] and observed" hacking of election machines and that he once "came to know about a memo" with unspecified contents.[7] Thus, his allegations about Defendants' conspiracy are essentially fictitious, and the Court will not presume their truth.

---

[4] *Compare* Compl. ¶¶ 6, 26, 61, 63, 133, 138, *with Ellis v. Jackson*, 319 F. Supp. 3d 23, 33 (D.D.C. 2018) (describing as "obviously frivolous" allegations of a "wide-ranging scheme, one that includes current and former government employees . . . from IRS employees to a former President to federal judges" (quotation omitted)).

[5] *Compare* Compl. ¶¶ 99, 118, 143; ECF No. 13-2 ¶ 17 *with Big Sky Civ. Tr.*, 2022 WL 1471423, at *1 ("[Plaintiff] alleges that he has been the target of coordinated plans between certain federal agencies, state and local government components, and private telecommunications companies over the past three decades."); *Tooley*, 586 F.3d at 1009 (noting that the supposed motive of the allegedly wrongful activity was "to persecute [Plaintiff] for remarks critical of the [government], remarks likely indistinguishable from those of millions of [others]"); *Walsh v. Comey*, 118 F. Supp. 3d 22, 26 (D.D.C. 2015) ("[Plaintiff] alleges a decades-long, government-wide conspiracy targeting him and perpetrated by numerous high-level government officials.").

[6] *Compare* Compl. ¶¶ 21–24, 26–36, 38–45, 48, 57, 60, 65–79, 81–83, 87, 89, 92, 96, 100–01, 106–09, 149, 152(k), *with Tooley*, 586 F.3d at 1009 (noting that an alleged conspiracy employed technology "well beyond state of the art"); *Lewis v. Bayh*, 577 F. Supp. 2d 47, 54 (D.D.C. 2008) (noting that an incredible alleged conspiracy had "cause[d] a power outage affecting the west side of Los Angeles").

[7] *Compare* Compl. ¶¶ 37, 84, 152(t), *with Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 233 (D.D.C. 2007) ("Plaintiff has only offered a laundry list of wrongful acts and conclusory allegations to support her theory of a conspiracy[,] which is insufficient to allow the case to go forward." (quotation omitted)); *Curran v. Holder*, 626 F. Supp. 2d 30, 34 (D.D.C. 2009) ("[P]laintiff's allegations . . . are conclusory and unsupported by factual details.").

11

That conclusion leaves Plaintiff's personal misfortunes, which the Court will assume happened. *See, e.g.*, *Lamb*, 2022 WL 203433, at *3. But those misfortunes are diffuse, and Plaintiff provides little detail about them. For example, he proposed, at his own cost, plans to develop a city that governing officials did not adopt. *See* Compl. ¶¶ 51, 97, 115, 152(dd). His meeting with an American company did not go as planned. *See* ECF No. 13-2 ¶ 8–13. His businesses experienced adversity, including even physical destruction, and he had to close some of them. *See* Compl. ¶¶ 103, 119, 143; *id*. at 53; ECF No. 13-2 ¶ 17. And his efforts to alleviate the effects of COVID-19 in India were not as effective as he hoped. *See* Compl. ¶¶ 53, 125.

Nothing about those allegations, however, suggests Defendants' involvement. They appear to be merely "a series of unconnected events" Plaintiff has lumped together "to support [his] conclusion that [he] has been singled out for harassment." *See Curran*, 626 F. Supp. 2d at 34. Most of life's disappointments are not caused by shadowy cabals of international criminals, and Plaintiff offers nothing concrete to suggest that he is the exception to that rule.

Thus, under the patently insubstantial doctrine, Plaintiff's claims "cannot go forward." *See Yi Tai Shao v. Roberts*, No. 18-CV-1233 (RC), 2019 WL 249855, at *16 (D.D.C. Jan. 17, 2019), *aff'd*, No. 19-5014, 2019 WL 3955710 (D.C. Cir. July 31, 2019). The Court will dismiss Plaintiff's complaint for lack of subject-matter jurisdiction.

### B. Plaintiff Has Not Made a Prima Facie Showing that the Court Has Personal Jurisdiction over Any Defendant

Even if Plaintiff's claims were not patently insubstantial, the Court would still deny his motion for default judgment and dismiss his complaint. That is because he also has not made a prima facie showing that the Court has personal jurisdiction over any defendant.[8]

---

[8] The Court need not have subject-matter jurisdiction to assess whether it has personal jurisdiction. *See Williams v. Romarm, SA,* 756 F.3d 777, 781 n.1 (D.C. Cir. 2014).

Personal jurisdiction has two variants: general and specific.  *See generally Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011).  A court has general jurisdiction—jurisdiction for all purposes—over a defendant in the forum where he is "at home."  *See Daimler A.G. v. Bauman*, 571 U.S. 117, 137 (2014).  A court has specific jurisdiction—jurisdiction linked to a particular claim—when the claim is sufficiently related to a defendant's contacts with the forum.  *See generally Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021).

To make a prima facie case for general jurisdiction, Plaintiff had to allege facts suggesting Defendants are continuously and systematically affiliated with the District of Columbia.  *See Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 15 (D.D.C. 2014).  For example, a court in this district found that standard satisfied when the plaintiff "submitted several public record searches and business filings[ ] indicating that . . . two limited liability companies . . . [with which a defendant was associated] both maintain a standard address in the District of Columbia" and systematically do business here.  *See GAG Enters., Inc. v. Rayford*, 312 F.R.D. 230, 232–33 (D.D.C. 2015).  For an individual, after all, the "paradigm forum" is his "domicile."  *Daimler A.G.*, 571 U.S. at 137.

Plaintiff's filings do not mention any specific action taken in the District of Columbia.  They say nothing about where any defendant lives or does business, although it is likely safe to infer that the officials of the Indian government live and conduct their busines in that country.  Thus, his filings do not provide any basis to infer that Defendants have continuous and systematic contacts with the District of Columbia, let alone that they are domiciled here.  So Plaintiff has not made a prima facie case for general jurisdiction.

Finding specific jurisdiction has two parts.  First, the Court must conclude that a statute authorizes jurisdiction against a nondomiciliary.  *See U.S. Dominion, Inc. v. Powell*, 554 F. Supp.

13

3d 42, 65 (D.D.C. 2021). Second, and if a statute does authorize such jurisdiction, the Court must conclude that the exercise of jurisdiction is consistent with the Due Process Clause. *See id.*

Even if the Court assumes without deciding that there is a statutory basis for jurisdiction, exercising it would not comport with due process. Thus, Plaintiff has not made a prima facie showing of specific jurisdiction.

To make such a showing, Plaintiff must allege "pertinent jurisdictional facts." *See First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). Those facts establish jurisdiction if they permit the Court to conclude that a defendant made purposeful contact with the forum and that Plaintiff's claims arise from those contacts. *See Ford Motor Co.*, 141 S. Ct. at 1024–25. That is, under this theory, Plaintiff needs "an affiliation between the forum and the underlying controversy." *See id.* at 1025 (quotation omitted). For a prima facie showing, those conclusions must be a "reasonable inference" from Plaintiff's filings. *See Lewis v. Mutond*, 62 F.4th 587, 593 (D.C. Cir. 2023) (quotation omitted).

Plaintiff's filings do not so much as mention the District of Columbia. All but two of the acts he mentions happened in India or (in Schwab's case) Switzerland. And both exceptions—the meeting with the American company, and the influencing of former Governor McDonnell's criminal case—happened in Virginia, not the District of Columbia. *See* Compl. ¶ 93; ECF No. 13-2 ¶¶ 9, 27. Moreover, for both sets of allegations, Plaintiff never even says who attended the meeting or bribed politicians. The man who attended the meeting is allegedly "a close friend of Narendra Modi"—but not necessarily a defendant or even acting on the prime minister's behalf. *See* ECF No. 13-2 ¶ 10. Thus, the Court has no conceivable basis, for several reasons, for inferring from Plaintiff's filings that *any* defendant made purposeful contacts with the District of Columbia, let alone in a way that gave rise to Plaintiff's claims.

14

Still, under Federal Rule of Civil Procedure 4(k)(2),⁹ the Circuit has recognized that a defendant's "contacts with the nation as a whole" can establish jurisdiction. *See Mwani*, 417 F.3d at 11. But even assuming that rule otherwise applies here, Plaintiff's allegations fall well short of the required showing under that rule too.

As relevant here, jurisdiction is sometimes established even without "specific, physical contact" with the United States. *See Mwani*, 417 F.3d at 12. That is so if a defendant's "efforts are purposefully directed" at the United States such that he has "fair warning that [his] activities would subject [him] to the jurisdiction of the United States." *Id.* at 13 (quotation omitted). In *Mwani*, for example, the Circuit found that standard satisfied as to Osama bin Laden and al Qaeda, noting that their objective for the conduct related to the plaintiffs' claims was "to cause pain and sow terror in . . . the United States." *Id.* That is a high bar, and it is not satisfied just because a defendant knew that his actions might impact a U.S. citizen or even the country generally. *See Lewis*, 62 F.4th at 595; *Livnat v. Palestinian Auth.*, 82 F. Supp. 3d 19, 33 (D.D.C. 2015) (distinguishing *Mwani* because the case "[did] not involve an attack on an American embassy or . . . involve overt acts, within U.S. borders, furthering a conspiracy to attack the U.S."), *aff'd*, 851 F.3d 45 (D.C. Cir. 2017). As another court in this district put it, to establish jurisdiction under this theory, a plaintiff's filings must "give rise to the conclusion that defendants must have been targeting the United States . . . as opposed to one resident." *See Cengiz v. Salman*, No. 20-CV-3009 (JDB), 2022 WL 17475400, at *12 n.17 (D.D.C. Dec. 6, 2022).

The Court could not so conclude from Plaintiff's filings. The only allegations conceivably

---

⁹ "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

15

relevant to that theory are his claims that some individuals laundered money in the United States, *see, e.g.*, Compl. ¶ 90, and that three defendants attacked "American investors" to induce them to leave India so Defendants could "grab their assets," *see* Compl. ¶ 136.[10]  Neither allegation suggests that Defendants' motivation was to harm the United States.  Plaintiff himself says the purpose of targeting American investors was to acquire wealth—not "to cause pain and sow terror in . . . the United States." *Mwani*, 417 F.3d at 12.  Even assuming Defendants knew that their actions would impact U.S. citizens, that awareness does not satisfy the standard.  *See Cengiz*, 2022 WL 17475400, at *12 n.17.

For those reasons, Plaintiff's filings do not permit the inference that the Court has either general or specific personal jurisdiction over any defendant.  Thus, the Court would deny his motion for default judgment and dismiss Plaintiff's complaint on this alternative ground even if it were not otherwise patently insubstantial.  *See Trudel*, 302 F. Supp. 3d at 144.

\*   \*   \*

Finally, the Court will not permit Plaintiff to amend his complaint.  The Court need not allow amendment if doing so would be "futile." *See James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).  And "given that the complaint is . . . patently insubstantial, allowing [Plaintiff] to amend it would be futile." *Lamb*, 2022 WL 203433, at *7.  Thus—although the Court's dismissal is on jurisdictional grounds and so operates without prejudice—its dismissal will be "final and appealable" as a dismissal of the case, not just the complaint. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020).

---

[10] Insofar as the Court can make any sense of Plaintiff's allegations that someone has created a parallel government and a parallel economy in the United States, *see* Compl. ¶¶ 92, 152(k), those allegations do not explain who is responsible, which does not allow the Court to connect *Defendants* with those activities.  Plaintiff mentions Prime Minister Modi's name in connection with that claim, *see* Compl. ¶ 92, but Prime Minister Modi is no longer a defendant.

16

## IV. Conclusion

For all the above reasons, the Court will deny Plaintiff's motion for default judgment and sua sponte dismiss the case. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 21, 2023